## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
### Miami Division

### Case No. 1:20-cv-23379

MASTEC NORTH AMERICA, INC. and
MASTEC, INC.,

        Plaintiffs,

v.

HOWARD MIDSTREAM ENERGY PARTNERS,
LLC; JOHN BLEVINS; GREG BLEVINS; and
BLEVINS BLS HOLDINGS, LLC,

        Defendants.

_____/

### COMPLAINT

Plaintiffs MasTec North America, Inc. and MasTec, Inc. sue Defendants Howard Midstream Energy Partners, LLC ("HMEP"), John Blevins, Greg Blevins, and Blevins BLS Holdings, LLC (collectively "Defendants") and state:

### INTRODUCTION

This is an action to recover damages jointly and severally from Defendants stemming from the tax audit of Bottom Line Services, LLC—an entity formerly owned by Defendants and acquired by Plaintiffs in 2012—covering the tax period from October 1, 2010 through February 28, 2014. During their ownership of Bottom Line Services, Defendants failed to maintain proper tax records and source documents, failed to file accurate tax returns, and failed to provide appropriate representations and warranties during the due diligence period, all in contravention of their duties under the Membership Interest Purchase Agreement entered into by the parties. Defendants' failures ultimately resulted in a significant tax settlement owed to the Texas

1

Comptroller's office, in addition to approximately $1,000,000 in legal fees and expenses. To date, and despite Plaintiffs' multiple demands, Defendants have refused to comply with their duty to indemnify Plaintiffs as clearly set forth in the Membership Interest Purchase Agreement, or otherwise pay any portion of these audit expenses. Accordingly, Plaintiffs bring this lawsuit to enforce their contractual rights under the Membership Interest Purchase Agreement.

## PARTIES, JURISDICTION, AND VENUE

1.      Plaintiff MasTec North America, Inc. is a Florida corporation with its headquarters located at 800 S. Douglas Road, 10th Floor, Coral Gables, Florida, 33134.

2.      Plaintiff MasTec, Inc. is a Florida corporation with its headquarters located at 800 S. Douglas Road, 10th Floor, Coral Gables, Florida, 33134.

3.      Defendant Howard Midstream Energy Partners, LLC is a Delaware limited liability company with its headquarters located at 16211 La Cantera Parkway, Suite 202, San Antonio, Texas, 78256.

4.      Defendant John Blevins is a Texas resident.

5.      Defendant Greg Blevins is a Texas resident.

6.      Defendant Blevins BLS Holdings, LLC is a Texas limited liability company with its headquarters located at 221 CR 136, George West, Texas, 78022.

7.      This Court has subject matter jurisdiction under 28 U.S.C. § 1332(a)(1) because the amount in controversy exceeds $75,000, exclusive of interest and costs, and no party is a citizen of the same state as any other adverse party.

8.      This Court has personal jurisdiction over all Defendants pursuant to Section 9.15.1 of the attached Membership Interest Purchase Agreement ("Purchase Agreement"), signed and executed by Defendants, which states that "[e]ach party, by its execution hereof, (a) hereby

2

irrevocably submits to the exclusive jurisdiction of the state courts of the State of Florida or the United States District Courts located in the Southern District of Florida for the purpose of any Action between or among the parties (or any of them) arising in whole or in part under or in connection with this Agreement." *See* Exhibit "A," Purchase Agreement, at 82.

9.      Venue is proper in this district pursuant to Section 9.15.2 of the Purchase Agreement, which states that "each party agrees that for any Action between the parties arising in whole or in part under or in connection with this Agreement, such party will bring Actions only in Miami-Dade County, Florida." *Id.*

<u>**FACTUAL ALLEGATIONS**</u>

***MasTec, Bottom Line Services, and the Purchase Agreement***

10.      MasTec North America, Inc. is a subsidiary of MasTec, Inc., a multinational infrastructure engineering and construction company based in Coral Gables, Florida.

11.      Over the last 80 years, MasTec, Inc. has been involved in some of the largest and most complex infrastructure construction projects across the country.  MasTec, Inc. is the second largest Hispanic-owned company in the United States.  MasTec, Inc. is certified as a Minority-Controlled Company by the National Minority Suppliers Development Council, and as a Minority Business Enterprise by the California Public Utilities Commission's Supplier Clearinghouse.

12.      On December 21, 2012, Plaintiffs entered into the attached Purchase Agreement with Defendants, whereby Plaintiffs acquired Defendants' ownership interests in Bottom Line Services, LLC ("BLS"), effective November 30, 2012 (the "Closing Balance Sheet Date").

13.      BLS is a company headquartered in George West, Texas.  It is a "provider of pipeline and gathering systems construction, midstream facility construction and midstream maintenance services, including directional boring, fabrication work, pipe fitting, gas treatment

3

plant hookups, stabilization system hookups, fabrication of launchers and receivers for gas gathering facilities, painting services, line clearing, hydro testing, fittings upgrades and right of way cleaning." *See* Exhibit "A," Purchase Agreement, at 1.

14. Pursuant to Section 8.4.1(a) of the Purchase Agreement, Defendants agreed to indemnify Plaintiffs for any taxes of BLS "allocable to any period ending on or prior to the Closing Balance Sheet Date [November 30, 2012] or allocable to any period that begins before and ends after the Closing Balance Sheet Date." *Id.* at 76.

15. Pursuant to Section 8.1.1 of the Purchase Agreement Defendants represented that they had "duly and timely filed all material Tax Returns" and that "all such Tax Returns were true, correct and complete in all material respects…" *Id.* at 71.

***Texas Comptroller's Audit of Bottom Line Services***

16. On September 9, 2013, the Texas Comptroller of Public Accounts sent a routine tax audit notice letter to BLS, which BLS forwarded to Plaintiff by email.

17. The audit was to cover the tax period from October 1, 2010 through February 28, 2014.

18. Pursuant to the Purchase Agreement, Defendants had made certain representations and warranties with respect to BLS's compliance with tax laws, agreed to disclose any material tax liabilities and material failures to comply with such tax laws, and agreed to retain and provide their tax records.

19. Plaintiffs relied on these representations and warranties and did not believe that the routine tax audit notice sent by the Texas Comptroller's office would result in a material tax loss to BLS.

4

20.     Plaintiffs also had relied on HMEP's sophistication and expertise in applying Texas sales and use tax laws for construction contractors to their business activities because they operated in Texas.

21.     Plaintiffs' reliance on Defendants' representations and warranties led to tax errors not being remedied for several years and contributed to much greater tax losses for BLS than there should have been.

22.     Plaintiffs would also come to discover over the course of the audit that there were many missing supporting tax documents at BLS, which created additional difficulties in reducing audit expenses.

23.     On October 8, 2013, Plaintiffs had a phone call with the auditor from the Texas Comptroller's office and discussed BLS's operations and how the audit would be conducted.  The auditor advised that the fieldwork for the BLS audit would not begin until sometime in early 2014.

24.     On January 24, 2014, the auditor emailed Plaintiffs that the audit would not commence until March 2014.

25.     Several months later, on May 23, 2014, the auditor emailed Plaintiffs and postponed the start of the audit again.  Over the next several weeks, the audit was rescheduled to July 16, 2014.

26.     The first audit meeting included a review of BLS's business activities and a tour of the buildings and the equipment that was on premises.

27.     The auditor required that Plaintiffs obtain a Power of Attorney from Greg Blevins, who was listed as an officer for BLS, in order to sign a statute extension and any other documents pertaining to the audit.

***Plaintiffs' First Notice of the Audit to Defendants***

5

28.     Section 8.3.1 of the Purchase Agreement states, in pertinent part, that Plaintiffs: "shall promptly notify each other upon receipt by such party of written notice of any inquiries, claims, assessments, audits or similar events with respect to Taxes of or with respect to [BLS] or the Assets thereof (any such inquiry, claim, assessment, audit or similar event, a 'Tax Proceeding')."

29.     On July 16, 2014, Plaintiffs emailed HMEP's CFO, Larry Murphy, notifying HMEP of the audit, which was later copied to Kariann Alexander via email, HMEP's corporate controller.  Plaintiff's prompt notice to Defendants of the audit complied with Section 8.3.1 of the Purchase Agreement.

30.     Upon receiving notice of the audit on July 16, 2014, HMEP failed to raise any objections as to the form or content of the notice it received; failed to exercise its rights to participate in and assume the control of the conduct of the audit; and failed to request any additional information about the tax audit, a copy of the audit notice letter, or a copy of any correspondence with the auditor.

***Plaintiffs' Second Notice of the Audit to Defendants***

31.     On July 25, 2014, Plaintiffs also notified Greg Blevins of the audit through an email to Dana Bednorz requesting that Mr. Blevins provide a Power of Attorney to allow Plaintiffs to sign a statute extension and any other documents pertaining to the audit.

32.     The same day, Plaintiffs received via email the Power of Attorney from Greg Blevins.

33.     Pursuant to Section 8.3.2 of the Purchase Agreement, Defendants were expressly granted both the right to participate in and the right to assume the control of the conduct of the tax audit relating to the pre-closing tax period (*i.e.,* before November 30, 2012).  For Defendants to

6

exercise their rights under Section 8.3.2, however, Defendants – not Plaintiffs – were required to take affirmative action.

34.     Upon notice of the BLS audit, at no time did any of the Defendants affirmatively express interest in participating in or assuming the control of the conduct of the tax audit, nor did any Defendant communicate their intent to exercise their rights under Section 8.3.2.

35.     Instead, HMEP waited until years had passed to involve itself in the tax audit and settlement proceedings and, at no point, opted to take control of the conduct of the tax audit or proceedings.  Specifically, it was not until March of 2019 that HMEP sought to get involved in the tax audit.

36.     The other Defendants – John Blevins, Greg Blevins, and Blevins BLS Holdings, LLC – never involved themselves in the audit proceedings at all, other than Greg Blevins signing and sending Plaintiffs the Power of Attorney.  Upon information and belief, HMEP became the lead for all Defendants.

37.     Any suggestion that Plaintiffs did not give Defendants the option to participate in or assume control of the audit and proceeding is, as detailed above, false.

***Additional Notices of the Audit to Defendants***

38.     On January 2, 2015, HMEP emailed Plaintiffs asking to release the $3,500,000 held in escrow in accordance with the Purchase Agreement and attaching a draft joint letter to be sent to the escrow agent.  Plaintiffs agreed to the release of the escrowed funds, except for $50,000 to be used as security for potential sales tax claims.  Plaintiffs believed that $50,000 was a sufficient amount to remain in escrow because they did not anticipate that the tax liability from the audit would be high. Plaintiffs did not waive any rights to indemnification from Defendants at that time.

7

39.     HMEP agreed, via letter and email, to this exception of the $50,000 for potential sales tax claims, and, again, did not opt to participate in the audit proceedings.

40.     Plaintiffs released the funds, in part, to maintain a working relationship with HMEP because HMEP had promised Plaintiffs that BLS would be awarded work with HMEP in the future. Moreover, Plaintiffs released these funds expecting indemnification and the good faith return of monies at the end of audit.

41.     On August 3, 2015, HMEP requested via email the return of the escrowed $50,000. In its communications requesting the return of the $50,000, HMEP failed to request any documentation related to the tax audit or additional information about it, and HMEP failed to exercise its rights to participate in or assume the control of the conduct of the audit.

42.     In March of 2016, Plaintiffs' sales tax manager, Wendy Duvall, contacted HMEP's tax manager, Delia Gaona, seeking assistance with locating the missing records for the audit. Emails were exchanged between the two from March 22, 2016 to March 28, 2016.  Not only was HMEP again notified of the audit, but Delia Gaona did, in fact, assist Wendy Duvall in locating missing invoices.

43.     On April 12, 2016, Plaintiffs and HMEP jointly instructed the escrow agent to release the $50,000 via email and fax.

44.     The same day, Plaintiffs emailed HMEP and reserved its right to bring an indemnity claim against Defendants once the audit was completed. *See* Exhibit "B," April 12, 2016 Email Chain.

45.     Once again, HMEP failed to take any action to involve itself in or assume control of the tax audit.

8

46.     In August of 2016, the auditor submitted the audit to her supervisor at the Texas Comptroller's office for review.

47.     In September of 2016, Plaintiffs received an initial audit assessment from the Texas Comptroller's office, in which the Texas Comptroller determined that BLS was liable for approximately $19,015,909 in sales taxes and $4,873,639 in interest and penalties.

48.     After receiving this initial audit assessment, Plaintiffs engaged the law firm of Scott, Douglas, McConnico ("SDM") to file a petition for redetermination on Plaintiffs' behalf to challenge the audit results.

49.     SDM is a law firm in Austin, Texas that specializes in sales tax consulting and, upon information and belief, has a very good relationship with the Texas Comptroller's office. This firm was chosen to provide their expertise and to use their connections within the Comptroller's office to assist Plaintiffs.

50.     On October 13, 2016, SDM filed a Petition for Redetermination and Statement of Grounds to challenge the audit results, which allowed Plaintiffs more time to locate records and information to reduce the amount of the tax liability.

51.     In its Statement of Grounds, Plaintiffs raised numerous categories and objections for why the liability amount should be reduced.  This was by design.  In the State of Texas, it is incumbent upon any company undergoing a sales tax audit to be overly broad and provide as many categories as possible in its petition for redetermination because the auditor or hearing officer is not obligated to accept documentation or information for any category not listed in the petition. Moreover, Plaintiffs reasonably raised all available arguments it had or might have to fully preserve its administrative rights to appeal the Texas Comptroller's assessment.

**HSM** 1600 Ponce De Leon Blvd, Suite 1205, Coral Gables, FL 33134  |  **305-800-4476**  |  **hsmpa.com**

52.     Between October 2016 and October 2018, Plaintiffs, alongside BLS's employees, continued working to locate missing records, making multiple trips to George West, Texas.

53.     Between November 2018 and February 2019, Plaintiffs made three additional trips to George West, Texas to go through boxes of records, again, to try to locate the missing invoices. After the third trip, Plaintiffs were able to locate some of the missing documents, however, not enough to obtain a substantial reduction in liability.

***Finally, HMEP's Participation in the Audit***

54.     On March 13, 2019, Plaintiffs reached out to HMEP, once again, via email to remind it of its obligations under the Purchase Agreement.  Plaintiffs also mailed HMEP a written letter demanding HMEP fulfill its obligation to indemnify Plaintiffs for any pre-closing tax losses for BLS as required under the Purchase Agreement.

55.     On March 25, 2019, Plaintiffs received an email from HMEP indicating that HMEP had received the letter and would like to set up a call to understand the status of the audit.

56.     On March 26, 2019, almost five years after Plaintiffs' initial communication to HMEP, HMEP hosted a conference call with Plaintiffs to discuss the status of the audit.  It was at this time when HMEP finally expressed more interest in participating in the tax audit and proceeding.  That same afternoon, HMEP requested via email for the first time various information and documents related to the audit.

57.     Without delay, Plaintiffs emailed HMEP information and documents, which included the official letter from the Comptrollers' office; the audit report; the Texas Notification of Audit Results; the index to working papers plus all detail exam reports; the Agreement to Extend Period of Limitation; the Notification of Sampling Procedures for State Tax Audit; the population and sample base on an Excel spreadsheet; the hearing officer's name; the updated exam reports

for the audit showing liability; BLS consultant information; and a list of customers and vendors in which BLS had reached out for third party verification.

58.     Thereafter, Plaintiffs and HMEP cooperated and worked closely with each other in responding to the Texas Comptroller's requests and inquiries, locating information, and contacting customers.

59.     Despite HMEP's attempts to gather relevant documentation and information in reviewing the same information that Plaintiffs had already gone through numerous times already, much of what HMEP found in the boxes of records turned out to be duplicative of the limited documentation and information Plaintiffs already had produced to the Texas Comptroller's office. It became clear to Plaintiffs that HMEP would be unable to produce all documentation and information necessary for the audit. Accordingly, Plaintiffs and HMEP began contacting customers to obtain relevant information, and progress was made on both sides.

60.     Still, Section 8.2.1 of the Purchase Agreement required HMEP to retain all books and records with respect to BLS's taxes for at least seven years after the closing date of the Purchase Agreement.

61.     In contravention of Section 8.2.1, it is apparent that:

     a.  HMEP had failed to provide Plaintiffs with all its records during the due diligence period;

     b.  HMEP failed to comply with its obligations to retain its records for seven years; or, at worst,

     c.  HMEP, as one of the members of BLS, submitted many tax returns to the state of Texas for BLS without having the necessary supporting documentation or information.

**HSM**  1600 Ponce De Leon Blvd, Suite 1205, Coral Gables, FL 33134  |  **305-800-4476**  |  **hsmpa.com**

62.     On April 15, 2019, the Reply to the Position Letter was submitted to the audit hearing officer, along with all information that was gathered from the period of October 2018 through March 2019.  Plaintiffs had previously emailed HMEP's counsel a draft of the Reply on April 12, 2019, for edits and feedback.

63.     The Reply phase of the audit is undoubtedly the most important, as a taxpayer can amend its Statement of Grounds up until the date of the Reply to the Position Letter.

64.     HMEP was an active participant in this critical phase of the audit and worked closely with Plaintiffs in drafting the Reply.  As such, any insufficiency in the documentation and information and any issues with the contents of the previous submissions could and should have been addressed and resolved by HMEP during this phase of the audit.  Moreover, HMEP can hardly claim now that their voluntary lack of participation in the early phase of the audit had any effect on the ultimate expenses owed.  Although Plaintiffs secured several extensions in the deadline for BLS to submit its Reply to the Position Letter, HMEP was unable to fully address the insufficiency of the documentation and information related to BLS's taxes.  Further, many of BLS's pre-closing tax returns to the State of Texas turned out to have been made with no supporting documentation or information.

***First Reduction of Audit Amount and Referral to Settlement Group***

65.     On August 2, 2019, the audit hearing officer served Plaintiffs with a Response to the Reply to Position Letter informing Plaintiffs and HMEP the initial tax assessment had been lowered, and requesting the Plaintiffs either dismiss the redetermination request or provide dates for docketing the case for a formal hearing before the Texas State Office of Administrative Hearings.

**HSM**   1600 Ponce De Leon Blvd, Suite 1205, Coral Gables, FL 33134   |   **305-800-4476**   |   **hsmpa.com**

66.     Based on Plaintiffs' and HMEP's understanding of the intractability of the Texas Comptroller's auditor and hearing officer and the unlikelihood of successfully presenting a case to an administrative law judge with the limited documentation and information available, Plaintiffs and HMEP decided to try to refer the tax audit from the Comptroller's hearings section to a new group of auditors with the office of the Chief Settlement Officer ("settlement group").

67.     On or about August 14, 2019, the Texas Comptroller's office agreed to refer the audit to the settlement group.

68.     This referral of the audit to the settlement group was entirely discretionary on the part of the Comptroller's Office, and such a referral is not typical for an audit at an advanced stage of the hearings process.  The referral was secured through Plaintiffs' counsel's relationships with the Executive Division of the Comptroller's Office.

69.     On October 17, 2019, a joint meeting was scheduled with the settlement group to include representatives of Plaintiffs and HMEP.  Plaintiffs and HMEP worked together to prepare for this joint meeting, and Plaintiffs offered to allow HMEP's representatives to take the lead at the meeting in presenting arguments and evidence to the settlement group.   HMEP's representatives accepted the offer.

70.     The settlement group auditors informed Plaintiffs that the HMEP representatives had arrived early to the joint meeting, and proceeded to make unfavorable comments about Plaintiffs to the auditors, which potentially damaged Plaintiff's credibility.

71.     The auditors later asked if Plaintiffs' counsel would handle the remainder of the negotiations because HMEP's representative, Delia Gaona, had a challenging demeanor, and asked that she not lead any more face-to-face meetings between Plaintiffs and the settlement group.

**HSM**   1600 Ponce De Leon Blvd, Suite 1205, Coral Gables, FL 33134   |   **305-800-4476**   |   **hsmpa.com**

72.     Although Plaintiffs came to the meeting in good faith and with a sincere attitude of cooperation with HMEP, upon learning that HMEP had apparently no wish to work in a cooperative manner, Plaintiffs took a more active participation in all future communications with the settlement group.  HMEP's representatives, however, were advised of all communications from the settlement group and allowed input throughout the entire settlement process.  Recall, HMEP could have taken control of the audit.

73.     Plaintiffs were well within their rights to retain control of communications with the new auditors. Section 8.3.2 of the Purchase Agreement states: "If the Sellers do not assume the defense of any such audit or proceeding promptly, Buyer may defend and settle the same (for the Sellers' account and at their expense) in such reasonable manner as it may deem appropriate." Because HMEP never assumed control of the audit, they forfeited any right they had to control communications relating to the audit.

***Second Reduction of Audit Amount***

74.     On March 18, 2020, the settlement group called Plaintiffs' tax attorneys offering to settle the audit.  The settlement group did not provide any detailed breakdown of the settlement amount, as is customary.  The settlement group further requested a written explanation of the basis for any additional reductions before considering another meeting, which HMEP was aware of.

75.     On April 14, 2020, Plaintiffs' attorneys emailed the final settlement memorandum to the Texas Comptroller's office.  HMEP actively participated in the writing and content of that memorandum.

***Final Reductions of Audit Amount, and Defendants' Failure to Indemnify***

14

76.     On April 15, 2020, the Texas Comptroller's office made a verbal offer to settle the audit. This verbal offer was followed up with an email from the Chief Settlement Officer later that same day to Plaintiffs' attorneys confirming the offer.

77.     On April 21, 2020, Plaintiffs' attorneys emailed HMEP's attorneys asking to confirm that the settlement offer they had received would be acceptable, and HMEP's attorneys approved.

78.     Plaintiffs' attorneys were able to successfully negotiate an additional reduction to the previous settlement offer.

79.     On April 28, 2020, the Texas Comptroller's office made a final offer to settle the audit.

80.     On April 29, 2020, Plaintiffs' counsel emailed HMEP a request for its position on the proper allocation of the settlement amount between Plaintiffs and Defendants.  HMEP refused to respond in a timely fashion.

81.     On May 13, 2020, a settlement agreement was executed by BLS and the Texas Comptroller. The settlement agreement contains a confidentiality provision, but permits acknowledging the existence of the agreement itself.

82.     In addition to the settlement amount owed to the Texas Comptroller's office, approximately $1,000,000 in legal fees and expenses were also incurred throughout the audit process.

83.     On May 22, 2020, Plaintiffs' counsel emailed HMEP a copy of the executed settlement agreement.

84.     On June 5, 2020, HMEP faxed Plaintiffs its position letter.

HSM   1600 Ponce De Leon Blvd, Suite 1205, Coral Gables, FL 33134   |   305-800-4476   |   hsmpa.com

85.     On August 5, 2020, Plaintiffs paid the audit settlement amount through the Texas Comptroller's website via an electronic funds transfer transaction.

86.     To date, Defendants have not paid any portion of the settlement amount and audit expenses, despite their contractual obligation under the Purchase Agreement to indemnify Plaintiffs for tax-related expenses "allocable to any period ending on or prior to the Closing Balance Sheet Date [November 30, 2012] or allocable to any period that begins before and ends after the Closing Balance Sheet Date." Purchase Agreement at 76.

**COUNT I**
**BREACH OF CONTRACT**
**(All Defendants)**

87.     Plaintiffs re-allege and incorporate paragraphs 1-86 above.

88.     On December 21, 2012, Plaintiffs and Defendants entered the attached contract, the Membership Interest Purchase Agreement, whereby Plaintiffs acquired Defendants' ownership interests in Bottom Line Services, LLC, effective November 30, 2012.  *See* Exhibit "A," Purchase Agreement.

89.     Pursuant to Section 8.1.1 of the Purchase Agreement Defendants represented that they had "duly and timely filed all material Tax Returns" and that "all such Tax Returns were true, correct and complete in all material respects… ."

90.     Pursuant to Section 8.2.1 of the Purchase Agreement, Defendants had a duty to retain all books and records with respect to BLS's taxes for at least seven years after the closing date of the Purchase Agreement.

91.     Pursuant to Section 8.4.1(a) of the Purchase Agreement, Defendants had a duty to jointly and severally indemnify Plaintiff for any taxes of BLS "allocable to any period ending on

or prior to [November 30, 2012] or allocable to any period that begins before and ends after [November 30, 2012]." Exhibit "A," Purchase Agreement, at 76.

92.     On April 12, 2016, Plaintiff reserved their right to seek indemnity from Defendants once the tax audit was completed. *See* Exhibit "B."

93.     On May 13, 2020, a settlement agreement was executed by BLS and the Texas Comptroller.

94.     In addition to the settlement amount owed to the Texas Comptroller's office, approximately $1,000,000 in legal fees and expenses were also incurred throughout the audit process.

95.     Under the Purchase Agreement, Defendants had a duty to indemnify Plaintiffs for all tax-related expenses during the period of their ownership of BLS.

96.     Defendants have failed to indemnify Plaintiffs or otherwise pay any portion of the total audit expense and as such Plaintiff have been damaged.

97.     Additionally, Defendants failed to retain and failed to provide proper source documents which would have ensured a smoother audit process.

98.     Indeed, Defendants did not retain all tax records during their ownership of BLS before the sale of the company to Plaintiffs.   Had Defendants properly maintained the proper tax records of BLS during their ownership of the company, the overall tax liability would have been significantly less.

99.     Defendants have materially breached the Purchase Agreement and caused Plaintiffs damages by, including but not limited to:

> a.   Failing to indemnify it for their portion of the total audit expense;
>
> b.   Failing to keep proper records;



    c.   Failing to retain and provide proper source documents;

    d.   Failing to file accurate tax returns during the relevant time periods;

    e.   Failing to provide proper warranties and representations relating to potential tax liabilities in the Purchase Agreement, and;

    f.   Failing to be cooperative during the compromise and settlement process.

100.   Despite Plaintiffs' multiple demands to Defendants, Defendants continuously refuse to pay.

WHEREFORE, Plaintiffs demand a judgment against Defendants and an:

    a.   Award of damages;

    b.   Award of attorneys' fees;

    c.   Award of interest and costs; and

    d.   Award of such other and further relief as the Court deems just and proper.

### COUNT II
### UNJUST ENRICHMENT
### (All Defendants)

101.   Plaintiffs re-allege and incorporate paragraphs 1-86 above.

102.   As a result of the Texas Comptroller's audit of Bottom Line Services, LLC based on the tax period of October 1, 2010 through February 28, 2014, Plaintiffs incurred significant expenses.

103.   Plaintiffs conferred upon Defendants the massive benefit of paying for the expenses relating to the audit of Bottom Line Services, LLC, despite Defendants having owned BLS from October 1, 2010 to November 30, 2012.

**HSM** 1600 Ponce De Leon Blvd, Suite 1205, Coral Gables, FL 33134  |  **305-800-4476**  |  **hsmpa.com**

104.    Defendants were aware of, and accepted, this benefit when, on April 21, 2020, Plaintiffs' attorneys asked HMEP's attorneys to confirm that the settlement offer they had received would be acceptable, and HMEP's attorneys approved.

105.    It would be unjust and inequitable for Defendants to obtain this benefit without paying for their share of the audit expenses relating to their period of ownership of BLS.

WHEREFORE, Plaintiffs demand a judgment against Defendants and an:

a.   Award of damages;

b.   Award of interest and costs; and

c.   Award of such other and further relief as the Court deems just and proper.

Dated: August 13, 2020.

Respectfully submitted,

**HEISE SUAREZ MELVILLE, P.A.**

1600 Ponce De Leon Boulevard
Suite 1205
Coral Gables, Florida 33134
Telephone (305) 800-4476

/s/ Luis E. Suarez
Luis E. Suarez
Florida Bar No. 390021
lsuarez@hsmpa.com
Patricia Melville
Florida Bar No. 475467
pmelville@hsmpa.com
Mark J. Heise
Florida Bar No. 771090
mheise@hsmpa.com

*Attorneys for Plaintiffs*

19

